UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

MARIANNA M. WILLOUGHBY,              )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )   Civil Action No. CV96-8-1029-NE
                                     )
WESTINGHOUSE ELECTRIC                )
CORPORATION,                         )
                                     )
        Defendant.                   )

**ENTERED**

SEP 2 3 1997

### MEMORANDUM OPINION

Plaintiff, Marianna Willoughby, asserts that defendant, Westinghouse Electric Corporation, discriminated against her because of her gender, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e et seq. Ms. Willoughby further alleges that she was discriminated against because of a disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq. Plaintiff's ADA claim is based upon both her own, alleged disability, and, her association with a disabled person: i.e., plaintiff's daughter is mentally retarded, suffers from seizures, and has behavioral difficulties. (Plaintiff's deposition at 24, 28-29; Dr. Pua deposition at 7.) During her employment, plaintiff suffered from depression which caused: increased crying, sleeplessness, and withdrawal from family life; affected her ability to concentrate; and made handling stress difficult. (Plaintiff's deposition at 21-22, 167-68.) The action presently is before the court on defendant's motion for summary judgment. Upon

37

consideration of the motion, pleadings, briefs, and evidentiary submissions, the court determines that motion is due to be granted.

## I. STATEMENT OF FACTS

Plaintiff was hired as a "Manufacturing Specialist/Machining" at defendant's electrical components plant in Fort Payne, Alabama on June 7, 1988.  She resigned her employment on September 14, 1995, following an attempt by her supervisor to counsel her for absenteeism and refusal to work overtime.  Plaintiff alleges the requirements imposed by her supervisor during that counseling session and other incidents of discriminatory treatment created a hostile work environment, and that her voluntary resignation actually amounted to a constructive discharge.

The September 14, 1995 attempt at counseling was the first step in defendant's five step progressive employee discipline program.  (Ross deposition at 151.)   In the first step, a supervisor informally identifies unacceptable job performance at an early stage, and gives the employee an opportunity to correct his or her conduct.   (Ross affidavit ¶ 21.)  The second step is a verbal warning, which identifies the unacceptable job performance, explains acceptable performance, coaches the employee on how to perform acceptably, and sets a specific time in which improvement is expected.[1]  (*Id.*)  Step three is a written warning, in which the expected level of job performance is clarified, and the employee discusses performance objectives with a reviewing manager.  (*Id.*)

---

[1] There are many references in the record to "corrective action plans" which may be imposed on employees.  Defendant's human resources manager, Scott Ross, testified that action plans are corrective measures that are instituted with every level of discipline after informal counseling.  (Ross deposition at 152.)

2

Step four requires leave without pay, during which the employee is interviewed and informed of the level of conduct required to retain employment with defendant. (*Id*.) Step five is discharge. (*Id*.)

## A. Overtime Policy, Absence Policy, and Plaintiff's Resignation

### 1. Overtime

#### a. Defendant's policy

At the inception of her employment, plaintiff received a copy of defendant's employee handbook, which states employees are expected to work "a reasonable amount of overtime." (Ross deposition at 21; plaintiff's deposition at 129-30.) Overtime requirements are determined on a weekly basis within each department of the Fort Payne plant. (Scott Ross affidavit ¶ 16.) Within each department, "teams" of employees work on specific tasks, and team officers seek volunteers from within the team to fulfill the week's overtime requirements. (*Id.* ¶ 15.) If overtime requirements cannot be met by volunteers, the overtime is considered "mandatory" and employees who refuse a directive to work extra hours receive "R's" (for refusal) on their attendance records. (Ross deposition at 44.) More than two "R's" within a six-month evaluation period result in an unsatisfactory rating in the "Works Overtime When Required" category of the employee's performance evaluation. (*Id.* at 76.)

#### b. Personal hardship exemption

Employees may receive a "personal hardship exemption" from overtime requirements. (Ross deposition at 47.) The personal hardship policy for the department in which plaintiff was employed read as follows: "If a team member has a situation that prevents

3

his/her from [sic] working overtime, the members' team will review the situation and decide how to handle it." (Ross deposition exhibit 8.)

In June of 1994, plaintiff requested a personal hardship exemption from her supervisor, Mike Blazer (Blazer affidavit, at ¶ 5), and presented a note from Dr. W.H. Welcher stating that she "should not work over 40 hours per week." (Blazer deposition at 55.) Plaintiff requested Fridays off, saying her daughter attended school on Friday and she could use that day for "personal time."[2] (Plaintiff's deposition at 152.) Blazer instructed plaintiff to speak with other team members about her request. She alleges the team approved. (*Id.* at 113.)

### c.   ADA requests for overtime exemption

Requests for accommodation under the ADA are processed by defendant's management, rather than the employee's team.[3] (Ross deposition at 65.) Defendant contends it became aware of plaintiff's alleged disability (depression) on November 14, 1994, when Mike Blazer asked plaintiff to work overtime.[4] (Blazer deposition at 136.) Plaintiff asserts she told Blazer that her doctor's note excused her from working overtime, to help cope with

---

[2]Plaintiff also was granted leave to care for her daughter from May 29, 1995 to August 21, 1995, pursuant to the Family Medical Leave Act.

[3]Plaintiff disputes this fact on her unilateral belief that the "personal hardship" exemption is an ADA accommodation. (Opposition to defendant's statement of facts 70, 71.) Nevertheless, plaintiff presents no facts disputing defendant's policies. Therefore, this court considers the ADA accommodation policy an undisputed fact.

[4]Plaintiff disputes this contention, and claims that she informed Blazer that the "personal hardship" was also necessary to assist in treatment for her depression. (Plaintiff's deposition at 147-49.)

4

her depression. (*Id.*) Upon learning that plaintiff claimed that condition inhibited her ability to work overtime, Blazer dealt with plaintiff's request as one for accommodation of a disability, and referred the matter to defendant's employee relations manager, Jim Houston. (Blazer affidavit ¶ 9.)

**d. Medical testimony on ability to work overtime**

On November 23, 1994, Houston asked plaintiff to provide additional medical information concerning her condition. (Houston deposition at 74-75.) Plaintiff produced a letter from Dr. W.H. Welcher, dated December 9, 1994, advising that plaintiff should work no more than 40 hours a week, but failing to specify a point at which plaintiff would be able to return to overtime work. (*Id.* at 75.) Dr. Welcher left his practice shortly thereafter, and referred plaintiff to the care of Dr. Allen Krichev.

Before Dr. Welcher left his practice, however, Jim Houston asked Dr. Timothy Decker (one of several physicians to whom defendant refers employees for treatment and evaluation of occupational injuries (Decker deposition at 7)) to contact Welcher for more information on plaintiff's prognosis. Dr. Decker and Dr. Welcher had a conversation, from which Dr. Decker gained the impression that plaintiff could work eight to ten hours of overtime each month (Decker deposition at 10), although Dr. Welcher later denied any such statement. (Welcher deposition at 16-17.) Jim Houston then wrote a letter to Dr. Welcher confirming Dr. Decker's understanding of their conversation but, by that date, Dr. Welcher was no longer practicing in the area, and he did not respond.

5

Dr. Krichev received Houston's letter, but would not release plaintiff to work overtime until he personally examined her, and formed an independent diagnosis. (Krichev deposition at 6.) Dr. Krichev examined plaintiff on January 20 and February 24, 1995, determined plaintiff could work eight to ten hours of overtime each month, and informed defendant of that determination. (Krichev deposition at 21-22.)

From June 24, 1994 through September 14, 1995 (the date of her resignation), plaintiff nevertheless worked more than 40 hours a week on two occasions only: the weeks of September 16, 1994; and, December 9, 1994. (Blazer affidavit ¶ 18.) Plaintiff refused mandatory overtime on the following dates: May 19, 1995; September 1, 1995; and September 8, 1995. (Scott Ross affidavit ¶ 24.)

## 2. Absence policy

Defendant's employees are subject to discipline when they incur more than two unexcused absences within a six month evaluation period. (Ross affidavit ¶ 20.) Plaintiff received an unexcused absence on September 6, 1995, when she stayed home for one day after serving jury duty. (Ross affidavit ¶39.) Plaintiff received a second, unexcused absence one week later, on September 13, 1995, when she missed work to attend court with her husband.[5] (Id.)

---

[5]Plaintiff claims the absences should have been excused or charged against her vacation days (Opposition to defendant's statement of fact 177), but presents no evidence regarding the availability of her vacation days, or defendant's policy for excusing absences. Plaintiff's mere belief that the absences should have been excused does not establish that assertion.

6

### 3. September 14, 1995 resignation

The day after plaintiff's second, unexcused absence, Mike Blazer counseled Ms. Willoughby about her absences and refusals to work overtime. Blazer told her that she would receive a written warning and action plan if she incurred another, unexcused absence. (Plaintiff's deposition at 209-10; Blazer deposition at 64-65.) He also told plaintiff that she would be requested to work overtime the following weekend and, if she refused, she would receive another action plan.[6] (Blazer deposition at 64-65.) Plaintiff still refused to work overtime, saying she had promised to drive her mother to the doctor. (Plaintiff's deposition at 153.) Plaintiff also told Blazer that she felt harassed and discriminated against, and wanted to submit a notice of resignation. (*Id.* at 211-12.) Blazer and his supervisor, Jim Mitchell, then met with plaintiff, but she persisted in her decision to resign. (Plaintiff's deposition at 214-217.)

Plaintiff filed a charge of discrimination with the EEOC the following day (September 15, 1995), and instituted this action on April 22, 1996. The record is not clear on the date plaintiff received her notice of right to sue from the EEOC, but the court presumes this action was timely, because defendant has raised no limitations defense.

---

[6]Blazer told plaintiff he was willing to excuse her May 19,1995 absence, presumably because it occurred before plaintiff took family leave. (Blazer deposition at 145-46.)

7

**B.    Other Allegations of Discrimination**

While Blazer's counseling obviously was the precipitating factor leading to plaintiff's resignation, she alleges several other actions which she perceives as discriminatory.

**1.    Quality policy**

In January of 1995, plaintiff received an "unsatisfactory" rating on the quality portion of her performance evaluation. (Plaintiff's deposition at 95-96.)  In March of 1995, Mike Blazer gave plaintiff a verbal warning for quality difficulties, and placed plaintiff on a corrective action plan.    (Plaintiff's deposition at 184-85; Blazer deposition at 124.)  Plaintiff alleges that male co-workers named Dustin Dobbins, Terry Ferguson, and Barry Godwin did not receive similar treatment, despite their allegedly deficient performance.  (Plaintiff's deposition at 103.)

Defendant relies upon a Material Disposition Report ("MDR") system to report and correct errors in materials manufactured at its facility.  (Mitchell affidavit ¶ 4.)   When an employee makes an error, he or she notifies the team quality officer, and an MDR form is completed to evaluate the remaining usefulness of the material.  (*Id.* at ¶ 8; Mitchell deposition at 33.)  The MDR report does not identify the employee committing an error, but it <u>does</u> specify the machine on which the error occurred.  Employees work on one machine each shift; therefore, the employee responsibile for an error can still be determined by comparing the machine number to

8

the shift on which the error occurred.[7]  (Mitchell affidavit ¶ 11;
Blazer affidavit ¶ 11; Hamilton deposition at 30-31.)  The decision
to discipline for quality violations is made by management after
considering the severity, frequency, and type of error.[8]  (Mitchell
deposition at 12, 15-16; Mitchell affidavit ¶ 12; Blazer affidavit
¶ 12.)

## 2.  Allegations of Harassment

Plaintiff recites a litany of other events which she perceived
as harassment by defendant:

> a.  In 1989 or 1990, co-worker Keith Overby told
>     plaintiff "a woman's place was at home barefoot and
>     pregnant."  (Plaintiff's deposition at 177.)
>
> b.  In 1990 or 1991, co-worker Terry Ferguson told
>     plaintiff she could obtain a particular job if she
>     slept with her supervisor.  (Id. at 73.)
>
> c.  In 1990 or 1991, plaintiff's supervisor, Jimmy
>     Pagan,[9] placed plaintiff on an action plan for
>     "early quits," but allegedly did not discipline male
>     employees with several tardy work days.  (Id. at
>     65-68.)
>
> d.  In 1990, plaintiff was required to dismantle her
>     machine at the end of a job, but male employees
>     were not.  (Id. at 45.)

_____

[7]Plaintiff responds to this statement of fact merely by saying it is
disputed, and referring this court to her deposition, her husband's deposition,
and the affidavits of eight Westinghouse employees.  (Opposition to defendant's
statement of facts 139.)  This court has reviewed those evidentiary materials and
finds nothing to dispute defendant's method of tracing errors to particular
employees.

[8]Plaintiff claims this statement of fact "begs the ultimate question of
discrimination" (Plaintiff's opposition to defendant's statement of facts 141),
but points to no facts suggesting that severity, frequency, and type of error do
not control the managerial decision.  Therefore, this court accepts defendant's
policy as a statement of undisputed fact.

[9]Pagan was plaintiff's supervisor until 1991 or 1992.  (Plaintiff's
deposition at 42-43.)  Mike Blazer became plaintiff's supervisor in 1994.  (Id.
at 89.)

9

e.  In 1990, Jimmy Pagan scolded plaintiff about alleged betting in a football pool, but not male employees involved in the pool. (*Id.* at 60-62.)

f.  In 1990, Keith Overby told plaintiff she should not make her salary, because she was working in a "man's field." (*Id.* at 174-76.)

g.  In 1990 or 1991, plaintiff was not asked to train other machinists on the operation of a particular machine. (*Id.* at 73.)

h.  In 1991, plaintiff's raise was delayed while she was on an action plan, but male employees on action plans timely received their raises.[10] (*Id.* at 43.)

i.  In 1992 or 1993, Terry Ferguson refused to work with plaintiff. (*Id.* at 84-85.)

j.  In 1993 or 1994, co-worker Toney Wade told plaintiff she should not make her salary because she was working in a "man's field." (*Id.* at 179-80.)

k.  In December of 1994 or January of 1995, Terry Ferguson asked plaintiff if she had received a "Phantom Task Force" letter, referring to a derogatory letter written to another female employee. (*Id.* at 120-21, 291-92.)

l.  In January of 1995, Mike Blazer allegedly allowed co-workers to review plaintiff's performance, but did not allow plaintiff to conduct performance reviews.[11] (*Id.* at 187-88.)

m.  In January of 1995, someone carved the word "probation" into a tool box in plaintiff's work area, and left a sheet of paper in her work area with the word "probation." (*Id.* at 190-92.)

---

[10]Plaintiff perceived the delay as discrimination, and contacted an attorney about the matter, but elected not to file suit. (Plaintiff's deposition at 206-07.)

[11]Defendant states that Blazer conducted all performance evaluations, but he received input on the evaluations from plaintiff's team members. (Defendant's statement of undisputed facts 154.) Specifically, Blazer received input from Linda Bryant, the production officer for plaintiff's team. *Id.* Plaintiff disputes that assertion merely by saying that male co-worker Terry Ferguson conducted her evaluation. (Opposition to statement of facts 154.) Even so, plaintiff produces no facts disputing that at least one female employee gave input on her evaluation.

10

## II. SUMMARY JUDGMENT STANDARD

Plaintiff's complaint (a textbook example of "shotgun pleading") contains four counts, but seven allegations of discrimination: disability discrimination; perceived disability discrimination; failure to accommodate a disability; discrimination because of association with a disabled person; disparate treatment sex discrimination; hostile work environment sex discrimination; and, constructive discharge. Plaintiff's response to defendant's motion for summary judgment is as inartful as her complaint. She makes absolutely no effort to apply law to fact in response to defendant's motion for summary judgment.[12] Instead, plaintiff makes 133 separate allegations of fact, states broad-ranging principles of law, and concludes summary judgment is due to be denied.[13]

Presumably, plaintiff wants this court to read her alleged facts, and craft arguments in response to defendant's motion. The court will not do so.

Instead, the burden is on plaintiff to "go beyond the pleadings, and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

---

[12]For example, plaintiff's complete argument on her hostile work environment claim is encompassed in one sentence: "As noted in [the statement of facts] Willoughby has established gender discrimination rising to the level of a hostile work environment in violation of Title VII, and has set forth several instances of discrimination in her facts and exhibits which continued throughout her period of employment with Westinghouse."

[13]The court notes that defendant is not completely innocent in this matter, because it submitted 218 statements of "undisputed facts." In actuality, many of those assertions are disputed inferences which are better left to the realm of argument.

11

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2253, 91 L.Ed.2d 265 (1986)(emphasis supplied).

Plaintiff does not provide any specific facts demonstrating an issue for trial. Rather, she simply points to all of the facts, and states in conclusory fashion that summary judgment should be denied. Thus, plaintiff has not met the standard for withstanding summary judgment imposed by Rule 56, Fed.R.Civ.P., as elucidated by the Supreme Court. That conclusion is supported by Eleventh Circuit authority requiring the non-moving party, who bears the burden of proof at trial, to "point to evidence in the record or produce additional evidence" demonstrating a genuine issue of material fact. *Riley v. Newton*, 94 F.3d 632, 639 (11th Cir. 1996)(quoting *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116-17 (11th Cir. 1993))(emphasis supplied). Plaintiff points to nothing in the record, and fails to meet her burden in responding to defendant's motion for summary judgment. While summary judgment is proper on that ground alone, the court's review of the evidence demonstrates there are no genuine issues of material fact precluding summary judgment.

### III. AMERICANS WITH DISABILITIES ACT CLAIMS

### A. Disability Discrimination

Defendant alleges plaintiff did not suffer from an actionable disability, because the ADA only protects those who suffer an impairment which "substantially limits one or more major life activities." 42 U.S.C. § 12101(2). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. §

1630.2(i). In deposition, plaintiff stated her depression caused increased crying, sleeplessness, impaired concentration, difficulty handling stress, and withdrawal from family life. (Plaintiff's deposition at 21-22, 167-68.)

Defendant argues that none of those conditions affected a major life activity, and alternatively that the impairment was not substantially limiting. Plaintiff does not respond to those arguments, but instead alleges that "Willoughby's restriction against working overtime and her perceived disability arise from both her condition of depression and her relationship with her daughter." (Plaintiff's brief at 37.) The court interprets that argument to allege discrimination because of a perceived disability and association with a disabled person,[14] but assumes plaintiff still claims to suffer an actual disability.

Even if the court further assumes that plaintiff's impairment affected major life activities, she presents no evidence that those activities were substantially limited. In fact, plaintiff's complete proof of disability is found in one statement: "Marianna's depression caused her to take more time to learn new things, it diminished her capacity for handling stress, and it caused her to cry, withdraw from family life, and lose sleep." ("Opponent's Undisputed Facts" 111.) That assertion only establishes that plaintiff's activities were affected, not that they were substantially limited. Furthermore, the court has independently reviewed the deposition of plaintiff's expert, Dr. W.H. Welcher,

---

[14]The association discrimination claim is discussed at part III, D infra.

13

who diagnosed plaintiff with depression and restricted her from
working overtime. Dr. Welcher gave no testimony on the effects of
plaintiff's depression on any major life activity.[15]  Therefore,
plaintiff has failed to prove that she suffers from a disability
under the ADA, and summary judgment is appropriate.

**B.   Perceived Disability Discrimination**

The Eleventh Circuit defines one who is perceived to have, or
"regarded as having such an impairment," as:

> an individual who (1) has a physical or mental impairment
> that does not substantially limit major life activities
> but is treated by her employer as constituting such
> limitation; (2) has a physical or mental impairment that
> substantially limits major life activities only as a
> result of the attitudes of others toward such impairment;
> or (3) has no illness or malady defined by the EEOC as a
> physical or mental impairment but is treated by her
> employer as having a substantially limiting impairment.

*Gordon*, 100 F.3d at 912-13 (citing 29 C.F.R. § 1630.2(1)).

A perceived impairment must be <u>significant</u>.  *Gordon*, 100 F.3d
at 913; *Ellison*, 85 F.3d at 192; *Wooten v. Farmland Foods*, 58 F.3d
382, 385 (8th Cir. 1995); *Byrne v. Board of Education*, 979 F.2d
560, 564 (7th Cir. 1992).  "[A] significant impairment is one that
is viewed by the employer as generally foreclosing the type of
employment involved, not just a narrow range of job tasks."
*Gordon*, 100 F.3d at 913 (citations omitted); *see also Forrisi v.
Bowen*, 794 F.2d 931, 935 (4th Cir. 1986)("an employer regards an
employee as [substantially limited] in his or her ability to work
by finding the employee's impairment to foreclose generally the

---

[15]To the extent Dr. Welcher's limitation on overtime can be considered a
restriction on the major life activity of working, the court still determines
there is no proof of a substantially limiting impairment, because he allowed her
to work a normal 40 hour week.  See part III, B *infra*.

14

type of employment involved").

Plaintiff presents absolutely no evidence that defendant perceived her as foreclosed from the type of employment in which she was involved. In fact, the evidence demonstrates defendant believed she <u>could</u> perform her job assignments, and simply wanted her to perform <u>more frequently</u>. *See Brown v. Johns Hopkins Hospital*, No. 94-1875, 1995 WL 139328 at *4 (4th Cir. March 31, 1995)(employee's inability to work overtime did not demonstrate she was foreclosed from obtaining other jobs in her field). Thus, plaintiff was not perceived by defendant as disabled under the ADA, and could not be subject to discrimination on that basis.

## C.  Association with a disabled person

Plaintiff offers limited argument to support her assertion that defendant discriminated against her because of an association with her disabled daughter:

> As demonstrated by the unanimous medical testimony of the case, Willoughby's restriction against working overtime and her perceived disability arise from her condition of depression and her relationship with her daughter.
> . . .
> Willoughby was discriminated against regarding her relationship with her disabled daughter. Westinghouse, fully aware of the condition of Willoughby's daughter through the letters and forms submitted by pediatrician Dr. Pua, and through personal encounters with her by management, refused to allow Willoughby to use accrued vacation, personal hardship procedure, or an accommodation in order to allow Willoughby to care for herself or her daughter. Tommy Blevins avoided overtime without any procedure or exemption, and without discipline. Randall Williams avoided overtime without discipline or molestation to keep a monetary benefit. Jeff Hamilton likewise simply did not have to work the overtime that was required of Marianna Willoughby, despite her keeping her job on or ahead of schedule without working overtime.

(Plaintiff's brief at 38-39.)    That argument requests an

15

accommodation to allow plaintiff to care for her disabled daughter.

"The ADA does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability." *Tyndall v. National Education Centers Incorporated of California*, 31 F.3d 209, 214 (4th Cir. 1994). Furthermore, the interpretive guidance on the ADA forecloses the accommodation requested by plaintiff:

> [A]n employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities. Thus, for example, an employer would not be entitled to a modified work schedule as an accommodation to enable the employee to care for a spouse with a disability.

29 C.F.R. pt. 1630 app. Accordingly, summary judgment is due to be granted on plaintiff's claim for failure to give an accommodation to care for her daughter.

## IV.   SEX DISCRIMINATION

### A.   Hostile Work Environment

Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315, *reh'g denied*, 874 F.2d 821 (11th Cir. 1989).

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

16

29 C.F.R. § 1604.11(a)(3)(1981).[16]

The five elements of a *prima facie* Title VII claim for hostile work environment sexual harassment are: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon the employee's sex; (4) the harassment complained of affected a "term, condition, or privilege" of employment, in that it was "sufficiently severe or pervasive to alter the condition of [the victim's] employment and create an abusive working environment"; and (5) the employer either knew, or should have known of the harassment, but failed to take prompt remedial action and, therefore, is liable under principles of *respondeat superior.* *Henson*, 682 F.2d at 903-905; *Martin v. Norfolk Southern Railway Company*, 926 F. Supp. 1044, 1050 (N.D. Ala. 1996).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). When determining whether harassment is sufficiently severe or pervasive to bring it within Title VII's purview, courts must examine the totality of circumstances, including: "[t]he frequency of the

---

[16]In General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Supreme Court suggested the degree to which courts should defer to the E.E.O.C.'s interpretation of Title VII: "[w]e consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance...." (citations omitted).

17

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371.   After careful consideration of the entire record, this court concludes that the conduct of which plaintiff complains is neither sufficiently severe nor pervasive to create an environment that a reasonable person would find hostile or abusive.

Plaintiff alleges thirteen events which she perceived as harassing.[17]   However, those events occurred over a 63 month period. In fact, the majority occurred before 1992, more than three years prior to plaintiff's resignation.   From 1992 to 1995, plaintiff points to only five instances of allegedly discriminatory conduct.[18]

No reasonable jury could conclude that those five incidents, occurring over a 36 month period of time, were "pervasive," as that term is defined under Title VII.   *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987), *overruled on other grounds by Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2362, 105 L.Ed.2d 132 (1989)(to be deemed pervasive, the conduct must be more than episodic; it must be sufficiently continuous and concerted);

---

[17]See pages 9-10 *supra*.

[18]In 1992 or 1993, co-worker Terry Ferguson refused to work with plaintiff; in 1993 or 1994, co-worker Toney Wade told plaintiff she should not make her salary because she was working in a man's field; in December of 1994 or January of 1995, Terry Ferguson asked plaintiff if she had received a derogatory letter; in January of 1995, Mike Blazer allowed co-workers (including at least one female) to review plaintiff's performance, but did not allow plaintiff to conduct performance reviews; in January of 1995, someone carved "probation" into a tool box in plaintiff's work area, and left a sheet of paper in her work area with the word "probation."

18

*Katz v. Dole,* 709 F.2d 251, 256 (4th Cir. 1983)(isolated incidents generally will not be sufficient to create a hostile working environment); *Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995)("[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage"); *Weiss v. Coca-Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir. 1993)(relatively isolated incidences of non-severe conduct do not rise to the level of a hostile environment); *Christoforou v. Ryder Truck Rental,* 668 F. Supp. 294, 301 (S.D.N.Y. 1987)(although the level of behavior needed to create a hostile environment "cannot be precisely defined," it is "clearly more abusive, pervasive and persistent" than three specific incidents of sexual harassment over an 18 month period).

In addition, the alleged instances were not sufficiently "severe," as that term is defined in Title VII law. At least two of the five incidences have no identifiable connection to plaintiff's sex.[19] The other instances may be tangentially related to plaintiff's sex, but are not severe. For those reasons, summary judgment is appropriate on plaintiff's hostile work environment claim.

**B.  Disparate Treatment Claims**

Plaintiff establishes a *prima facie* case of disparate treatment on the basis of gender by showing: (1) she is female; (2)

---

[19]The refusal to allow plaintiff to conduct performance reviews has no connection because at least one other female employee undeniably was allowed to conduct such reviews, and the use of the word "probation" has no tie to plaintiff's sex.

19

an adverse employment action occurred; (3) she was treated worse than similarly situated males; and (4) a causal connection between her sex and the differential treatment. *Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415, 1421 (M.D. Ala. 1996); *Coaker v. Home Nursing Services, Inc.*, No. 95-0120, 1996 WL 316739 at * 10 (S.D. Ala. February 5, 1996); *Perkins v. School Board of Pinellas County*, 902 F. Supp. 1503, 1506-07 (M.D. Fla. 1995). Defendant argues plaintiff cannot satisfy the final three elements. Plaintiff barely offers a response, and only refers this court to definitions of a "personnel action" from the Civil Service Reform Act. (Plaintiff's brief at 34 (citing 5 U.S.C.A. § 2302(a)(2)(A).)

### 1. Continuing violation

Much of the allegedly disparate treatment complained of by plaintiff occurred before 1995. Thus, defendant argues those claims are time-barred, because plaintiff did not file a charge of discrimination with the EEOC within 180 days of those occurrences.[20] Plaintiff attempts to retain those claims by alleging a "continuing violation."[21]   Plaintiff's sole basis for claiming a continuing

---

[20]A charge of discrimination must "be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).

[21]"Where an employee charges an employer with continuously maintaining an illegal employment practice, he may file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice. However, where the employer engaged in a discrete act of discrimination more than 180 days prior to the filing of a charge with the EEOC by the employee, allegations that the discriminatory act continues to adversely affect the employee, or that the employer presently refuses to rectify its past violation, will not satisfy the requirement of 42 U.S.C. § 20003-5(e) that the plaintiff file his charge of discrimination within 180 days of the discriminatory act." Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 658 (11th Cir. 1993)(quoting Gonzalez v. Firestone Tire & Rubber Co., 610 F.2d 241, 249 (5th Cir. 1980)).

violation, however, is her assertion of a hostile work environment. (Plaintiff's brief at 33.)   The court doubts that a continuing violation for a hostile work environment could bootstrap untimely disparate treatment claims.   Even so, the court has already found that there was no hostile work environment; therefore, plaintiff's disparate treatment claims arising before 1995 are untimely.[22]

### 2.   Adverse employment actions

Defendant argues plaintiff cannot demonstrate she suffered any adverse employment actions.   Plaintiff does not respond to that argument, but her facts demonstrate three occurrences in 1995: in January, Mike Blazer gave plaintiff an unsatisfactory evaluation for quality; in March, Blazer gave plaintiff a verbal warning, and placed her on an action plan for quality; and, on September 14, 1995, Blazer counseled plaintiff for absenteeism and refusal of overtime.

For an action to be deemed "adverse," the terms, conditions or privileges of employment must be affected.   *Munday v. Waste Management of North America, Inc.*, Nos. 94-2192, 94-2193, 1997 WL 562173 (4th Cir. September 11, 1997); *Robinson v. City of Pittsburgh*, No. 95-3594, 1997 WL 386102 (3rd Cir. July 14, 1997); *Matthews v. Kilroy*, No. 95-4194, 1997 WL 377013 (6th Cir. July 3, 1997); *Rabvionwitz v. Pena*, 89 F.3d 482 (7th Cir. 1996).   Thus, counseling an employee does not rise to the level of an adverse employment action. *Mitchell v. Carrier Corp.*, 954 F. Supp. 1568, 1576 (M.D. Ga. 1995); *Nelson v. University of Maine System*, 923 F.

---

[22]The court is willing to consider all 1995 occurrences because plaintiff was on leave for 85 days of the 180 day period.

21

Supp. 275, 282 (D. Me. 1996); *Hicks v. Brown*, 929 F. Supp. 1184,
1190 (E.D. Ark. 1996); *Simmerman v. Hardee's Food Systems, Inc.*,
No. 94-6906, 1996 WL 131948 (E.D. Pa. March 22, 1996).

Plaintiff presents no evidence that her unsatisfactory
performance evaluations or action plan affected the terms,
conditions, or privileges of her employment. Thus, summary
judgment is appropriate for failure to prove an adverse employment
action.

### 3.    No other similarly-situated employees

Even if this court assumed that plaintiff's below average
quality evaluation and action plan for quality could constitute
adverse employment actions, summary judgment still would be
appropriate. The court agrees with defendant that plaintiff fails
to identify similarly situated male employees who received more
favorable treatment.

> As part of the Title VII plaintiff's *prima facie* case,
> the plaintiff must show that his employer treated
> similarly situated employees outside his classification
> more favorably than herself [sic]. ... To make a
> comparison of the plaintiff's treatment to that of non-
> minority employees, the plaintiff must show that he and
> the employees are <u>similarly situated in all relevant
> respects</u>.

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)(citations
omitted)(emphasis added). Plaintiff identifies male comparators,
but cannot demonstrate they are "similarly situated in all relevant
respects."

Plaintiff's comparators for quality-related counseling are
Dustin Dobbins, Terry Ferguson, and Barry Godwin. (Plaintiff's
deposition at 103.) Plaintiff admits, however, that she has no

22

evidence regarding the number of quality errors made by those male employees. (*Id.* at 103-04'.) Without such evidence, those employees cannot be considered similarly situated.

## VI. CONSTRUCTIVE DISCHARGE

Plaintiff's complaint alleges defendant's actions forced her to resign, and constituted a constructive discharge. (Complaint at 5 ¶ 31.) Defendant, however, alleges that plaintiff's working conditions were not so intolerable that a reasonable person in plaintiff's position would be compelled to resign. *See Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).

Plaintiff offers no argument which this court can interpret as a response to defendant's motion for summary judgment on the constructive discharge claim: indeed, the phrase "constructive discharge" is mentioned nowhere. Thus, plaintiff fails to respond to defendant's argument, and summary judgment is appropriate. *See Brewer v. Purvis*, 816 F. Supp. 1560 (M.D. Ga. 1993)("Summary judgment is appropriate since Plaintiff failed to respond to [defendant's] argument on this issue"); *see also Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1113 n.4 (S.D. Ala. 1997); *Southern Nevada Shell Dealers Ass'n v. Shell Oil*, 725 F. Supp. 1104, 1109 (D. Nev. 1989); *Valluzzi v. United States Postal Service*, 775 F. Supp. 1124, 1125 (N.D. Ill. 1991). Even so, the court agrees with defendant that no <u>reasonable</u> person would be compelled to resign. As noted in the discussion of plaintiff's hostile work environment claim, the events complained of by plaintiff were non-discriminatory conduct which occurred over a

23

five year period.  They did not make plaintiff's working conditions intolerable, and summary judgment is appropriate.

### V.  CONCLUSION

For the foregoing reasons, the court concludes that defendant's motion for summary judgment is due to be granted, and plaintiff's action dismissed with prejudice.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _23rd_ day of September, 1997.

_____
United States District Judge

24